# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

COMMITTEE TO SAVE THE RIO HONDO,

    Plaintiff,

vs.                                                         No. CIV 94-0589 JC/DJS

LEONARD LUCERO, Carson National Forest
Supervisor, United States Department of Agriculture,
Forest Service,

    Defendant,

    and

TAOS SKI VALLEY, INC.,

    Defendant-Intervenor.

## MEMORANDUM OPINION AND ORDER

THIS MATTER, alleging violations of the National Environmental Policy Act of 1969 ("NEPA"), was initially dismissed for lack of standing. The Tenth Circuit Court of Appeals reversed the standing ruling and remanded the action in February 1997 for a decision on the merits. See Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445 (10th Cir. 1996).

The Court has reviewed the original memoranda and supplemental briefs submitted by the parties. Having thoroughly examined the entire administrative record in this matter and the relevant authorities, I find that the agency's decision to not prepare a supplemental environmental impact statement was neither arbitrary nor capricious. Defendant's 1993 decision to approve summer recreational lift operations by Intervenor will therefore be upheld.

## Background

Intervenor Taos Ski Valley ("TSV") is located within the Carson National Forest near the headwaters of the Rio Hondo River. TSV operates a ski area under term and special use permits issued by the Forest Service in 1976 which include permission for "optional summer recreation operation and services of the chairlift and support systems." In 1981, the Carson National Forest Supervisor approved a master development plan ("MDP" or "Plan") accompanied by an environmental impact statement ("EIS") prepared in compliance with NEPA's provisions. The MDP/EIS direct and guide the development and operations on Forest Service lands at TSV for a thirty-year period.

In 1990, the Ski Area requested that the United States Forest Service ("USFS") allow some summertime operation of its facilities. Although summertime chairlift operations are authorized by the use permits, the 1981 MDP/EIS addressed only the environmental impacts of wintertime ski area operations. In considering the Ski Area's request, the Forest Service prepared an environmental assessment ("EA") rather than preparing a supplemental environmental impact statement ("SEIS"). An assessment contains a less exhaustive environmental analysis than does an impact statement. Defendant Leonard Lucero, Carson National Forest Supervisor, relied on the analysis set forth in the EA and prepared a finding of no significant impact ("FONSI"). His October 5, 1993 record of decision approved the Ski Area's proposed summer operations and a corresponding amendment to the Plan and special use permit.[1]

---

[1] The amendments allow TSV to operate only Lift #1 from 10:00 a.m. to 4:00 p.m., on Thursday through Monday, beginning the Thursday before Memorial Day through the month of September. Mountain bikes, hang gliders and dogs are specifically prohibited from the lift.

**Procedural Posture**

Prior to my dismissal of the action on standing grounds, Plaintiff filed a motion for partial summary judgment. However, since NEPA does not provide for a private right of action, Plaintiff in fact relies on the judicial review provisions of the Administrative Procedures Act (APA), 5 U.S.C. § 706, in bringing its claims. See State of Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998).[2] Thus, the Court ordered further briefing on the merits, given its understanding that this matter must be treated as an administrative appeal under the Federal Rules of Appellate Procedure.

**Analysis**

**I.     The Committee's Position**

After first exhausting its administrative remedies, the Committee brought this action claiming the Forest Service violated NEPA's procedures by failing to prepare a SEIS when the agency approved the summertime use of the Ski Area. Although the decision by the Forest Service to permit summertime use of a TSV lift precipitated the filing of this action, the Committee contends that an SEIS was required in light of other numerous amendments made to the MDP over the last decade.

The Committee asserts that the Forest Service's approved amendments to the MDP constitutes either a "major Federal action significantly affecting the . . . environment" or a "substantial change" to the plan, requiring the Forest Service to prepare a supplemental environmental impact statement. 42 U.S.C. § 4332(2)(C)(i-v) (1994). The Council on Environmental Quality

---

[2] "Motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994).

(CEQ) regulations[3] impose a duty on all federal agencies to prepare supplements to either draft or final impact statements if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c).

## II. Standard of Review

An agency's decision regarding the need for a supplemental EIS is reviewed under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989). This standard applies

> because the decision whether to prepare a supplemental EIS 'is similar to the decision whether to prepare an EIS in the first instance,' and is highly factual. Id. at 374, 377; see also Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992); Sierra Club v. Lujan, 949 F.2d 362, 367 (10th Cir.1991). Accordingly, 'as long as the [agency's] decision not to supplement the [Final] EIS was not 'arbitrary and capricious,' it should not be set aside.' Marsh, 490 U.S. at 377.

Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524 (10th Cir. 1992). Although this inquiry must be "searching and careful," the court's standard of review is quite narrow. Marsh, 490 U.S. at 378. NEPA itself does not mandate the particular decisions an agency must reach, only the necessary procedures the agency must follow while reaching its decisions. See Committee to Save the Rio Hondo, 102 F.3d at 448.

## III. The Amendment Permitting Summertime Use

### A. No Substantial Change to the Plan

When the Master Development Plan was initially developed and approved in 1981, "[n]o summertime use of lifts for the tourist/hiker [was] proposed or planned." MDP at 109. Thus, environmental impacts "specific to summer use" were not identified or addressed by the MDP/EIS.

---

[3] CEQ regulations are entitled to "substantial deference." See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355-356 (1989); Andrus v. Sierra Club, 442 U.S. 347, 358 (1979).

The Plan noted that "TSV, Inc. does not operate its lifts in the summer, so there would be no increased use in the summer due to the proposed action." MDP at 157.

The Committee argues that because the Plan did not originally call for use of the ski area for summer recreation activities, a decision to permit summertime use is contrary to the development plan and necessarily constitutes a "substantial change." Since use during the summer months was neither contemplated nor analyzed in its accompanying programmatic EIS, the Committee contends that the USFS was required to file an SEIS. I believe the Committee, using only a black and white pallette, paints this picture with too broad a brush.

The TSV Master Development Plan was intended to be a flexible document to guide the development and management of the public-owned lands for thirty years. As Defendant notes, the USFS policy is to "[e]ncourage summertime use of ski area facilities where that use is compatible with or enhances natural resource-based recreation opportunities and does not require additional specialized facilities." Forest Service Handbook 2343.11. Although expansion of the TSV recreational opportunities to include chairlift operations during a summer season was not anticipated in 1981, neither was it prohibited for all time.

To require the scope of a master development plan to be defined only by specific insights into the immediate future would emasculate the agency's ability to establish a long-term plan for development. Unnecessary energy and resources would be expended in assessing all possible future projects which are consistent with the goals of development. Moreover, as the Supreme Court recognized, agency decisionmaking is not intended to be "intractable, always waiting updated information only to find the new information outdated by the time a decision is made." Marsh, 490 U.S. at 373.

"[Q]uestions of whether there has been a substantial change in the action, or whether significant new information or circumstances have come to light, are 'classic example[s] of . . . factual dispute[s] the resolution of which implicates substantial agency expertise.'" Friends of the Bow v. Thompson, 124 F.3d 1210, 1218 (10th Cir. 1997), quoting Marsh, 490 U.S. at 376. Although the summertime use of lifts was not specifically addressed, the USFS concluded that such use was not outside the scope of the 1981 Master Plan. Having reviewed the administrative record, I find that the agency's conclusion of "no substantial change" to the MDP was neither arbitrary nor capricious.

**B. The Finding of No Significant Impact**

Having determined that summer use could be consistent with the development plan, NEPA required the USFS to address the extent of environmental effects of implementing the proposed action. Whenever a broad EIS has been previously prepared, such as the 1981 EIS at issue here, a less intensive EA may suffice for a "site specific action" included within the entire program or policy. 40 C.F.R. § 1502.20. The agency is authorized to integrate its conclusions into less exhaustive environmental assessments prepared for all subsequent and smaller actions. 40 C.F.R. § 1502.20. This "tiering" process is intended "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1508.28.

If the EA indicates that the proposed action will not significantly impact the environment, the agency may issue a FONSI and need not perform any further environmental analysis. 40 C.F.R. § 1501.4(e). An EA, such as the one prepared here, may serve a secondary purpose--to aid in the determination of whether a more extensive EIS is needed to provide further information

before a decision is made. 40 C.F.R. § 1501.4 and § 1508.9(a). Similarly, the EA may aid an agency in determining whether there is a need to supplement the current EIS.

The Committee categorically states that an SEIS was mandated because "the environmental and socio-cultural effects associated with summer use are "completely different in nature and extent than the effects of wintertime operation." Reply Br. at 3. Such speculation is just that--a mere "theoretical" distinction. In this case, the Forest Service properly undertook an EA to determine whether such hypothetical impacts, *in fact rather than in theory*, dictated a more extensive analysis.

A review of the record demonstrates that the USFS sought to identify and quantify any direct, indirect or cumulative environmental impacts associated with the proposed summertime recreational use of TSV facilities. "The analysis of the relevant information 'requires a high level of technical expertise'; accordingly, 'we must defer to 'the informed discretion of the responsible federal agencies.'" Marsh, 490 at 377, quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

> On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance--or lack of significance--of the new information.

Marsh, 490 U.S. at 378. It is against this backdrop that I find the Forest Service's decision to permit summer use without conducting an SEIS to be anything but "arbitrary and capricious."[4]

The administrative record consists of six three-inch volumes of documents too numerous to be individually discussed in this opinion. Suffice it to say that the agency thoroughly examined the

---

[4] Prior to the Marsh decision, many courts applied a "reasonableness" standard of review. Although the Marsh court clarified the appropriate standard, the Supreme Court noted that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." Marsh, 490 U.S. at 377 n.23.

specific and cumulative effect on potential concerns which had been thoroughly analyzed in the 1981 EIS including, but not limited to:

- ➤ water availability and anticipated consumption levels

- ➤ sewage treatment capacity and possible effects on the quality of the water supply

- ➤ effects on traffic levels, roads and air pollution

- ➤ impacts on soil erosion and vegetation[5]

- ➤ impacts on wildlife, their migration patterns and their susceptibility to disease[6]

- ➤ recreational access to the area by the physically disabled

- ➤ potential for increased risks and costs associated with fire, litter and search operations

- ➤ effects on local businesses and tourism

To establish a foundation for the environmental analysis, the USFS received objective information from several other ski areas which had undertaken summer recreation operations. The agency ascertained that summer lifts would attract approximately 200 people per day to TSV with two to four occupants per vehicle. The average length of stay by a summer visitor at the ski area was estimated at three hours.

Of special note, the EA extensively addressed the Committee's concerns regarding potential water impacts on the Rio Hondo and lower valley area. Plaintiff contended that each visitor would

---

[5] In response to potential damage related to erosion, the summertime operation amendment prohibited mountain bikes and hang gliders.

[6] Concerns that canine distemper virus could harm the pine marten population led the USFS to exclude dogs from the lift.

-8-

consume 200 gallons of water, but the agency discovered that this figure represents an amount used by a winter overnight visitor and includes gallons used for bathing, lavatories and laundry. Based upon the opinions of experts, the USFS reasonably found that the water consumption of a typical summer visitor to the TSV would be significantly less than the Committee's estimate. The determination that summer operations would not significantly affect the region's water quantity appears reasonable.

The EA also adequately addressed potential impacts on the quality of water for that area. The USFS examined the ability of the Twining Wastewater Treatment Facility to handle the impacts of summer operations, and found them to be adequate based upon expert analyses. Evidence supported the conclusion that much of the perceived decreased quality of water downstream from the ski area actually results from agricultural activities in the lower Rio Hondo Valley, not from TSV operations.

Finally, the EA adequately analyzed concerns regarding summer impacts on lands near and adjacent to the ski area. Taos Pueblo leaders feared that summer operations would result in increased trespass by hikers on their lands, especially as to Blue Lake--a site considered sacred by the Taos people. Environmentalists worried that the summer operations might lead to increased use of nearby Wheeler Peak Wilderness Area and compromise its surroundings. I cannot say that the EA failed to sufficiently address these valid concerns.[7]

In summary, the NEPA mandated public input and required the USFS to take a "hard look" at the evidence. The agency did so via an EA and found that no further supplementation to the EIS

---

[7] The amendment does not permit the summer sale of one-way lift tickets, at least in part to mitigate these concerns.

was necessary for making a fully informed decision. The USFS's conclusions that the new information offered by the opponents to summer operation was of "exaggerated importance" was based upon careful scientific analysis. See Marsh, 490 U.S. at 385. Having conducted a reasonable evaluation of the evidence, the agency's action in permitting summer lift operations at TSV without preparation of an SEIS was neither arbitrary nor capricious.

**III.     The "Cumulative" Effect of Amendments since 1981**

The Committee contends that an SEIS was needed because the MDP is "sorely out of date" in light of the aggregate effect of USFS-approved amendments since 1981. As the USFS correctly notes, the mere passage of time is insufficient to trigger a duty to prepare an SEIS. Plaintiff must show more than "some change" has occurred to warrant the preparation of an SEIS. Instead, the Committee must demonstrate that the change or changes raise significant environmental concerns that need further, more extensive analysis.

An EA was prepared for each of the six discrete identified amendments and resulting FONSI's were issued. The Committee argues that even if these assessments were individually adequate under NEPA for site-specific analyses, the cumulative effect of the amendments were required to be addressed in the context of a programmatic EIS. Plaintiff asserts that the USFS violated the NEPA procedural scheme by failing to prepare an SEIS analyzing the aggregate effects of the amendments. The USFS concluded that the cumulative effects of all amendments, including the summertime use of lifts, did not warrant an updated EIS. Again, I cannot say that this decision was arbitrary or capricious.

The Committee asserts that through piecemeal amendments, TSV has completed work and implemented projects that are outside of the scope of the original Plan. These amendments together

allegedly represent a substantial change to the approved development vision such that the 1981 MDP/EIS no longer guides or constrains TSV's development of the recreational area. Yet each of the amendments was either included in or arguably closely related to the approved conceptual MDP/EIS for the Ski Area: expansion of the parking area, relocation of the maintenance facility, upgrading of its Lift #1 rather than constructing an additional lift expressly approved in the MDP, building a new ski school facility, constructing a pedestrian trail and bridge with handicapped access to that facility, and permitting additional storage facilities. Far from being outside the scope, these modifications are directly related to serving the overall objectives set forth in the Plan. Moreover, these amendments *even in the aggregate* have not increased the 1981 MDP-stipulated maximum capacity of 4800 skiers at one time.

The Committee claims that the First Circuit's decision in Dubois v. United States Dep't of Agriculture, 102 F.3d 1273 (1st Cir. 1996), is directly on point. In Dubois, the USFS selected an alternative for development of a ski area in its final EIS which was *appreciably* different from any of the alternatives analyzed in the draft EIS. The court held that an SEIS was mandated when such a "new and different" alternative was chosen rather than those alternatives which had been reviewed and discussed with the public. Dubois, 102 F.3d at 1292-93.

The Dubois court found that the selected development alternative implicated circumstances and environmental effects "significantly" and "substantially" different from the alternatives which received an extensive assessment of the full environmental impacts.

> It would be one thing if the Forest Service had adopted a new alternative that was actually within the range of previously considered alternatives . . . . It is quite another thing to adopt a proposal that is configured differently, in which case public commenters might have pointed out, *if given the opportunity* -- and the Forest Service

-11-

might have seriously considered--wholly new problems posed by the new configuration. . . .

Dubois, 102 F.3d at 1292-93 (emphasis added). Thus, the First Circuit seemed particularly disturbed that the public never had the opportunity to comment on the alternative actually selected by the USFS.

In the present case, however, each of the site-specific development proposals was subject to an EA and the public was provided an opportunity for input on the chosen actions. The record is replete with letters, comments and meetings demonstrating meaningful public involvement in all stages of the decisionmaking process. Indeed, the USFS at one time considered whether preparation of a supplemental EIS was necessitated strictly on the basis of wide public interest and controversy surrounding the TSV development.

Furthermore, the USFS gave "a hard look" at the proposed amendments by addressing all potential concerns, even if purely speculative in nature, that were raised by the public. Although the Committee disagrees with the USFS evaluation that there are no significant environmental impacts associated with the amendments, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378. In the present case, the USFS sought input from knowledgeable experts in all areas and received opinions that amply support a finding of no significant environmental impact.

All of the relevant environmental assessments and the USFS's decision not to prepare a supplemental EIS are "founded on a reasoned evaluation of the relevant factors." Id. Because the agency has not arbitrarily or capriciously determined that a supplemental EIS is unnecessary, there

has been no violation of NEPA procedures, and the decision to permit summer operations at TSV will be upheld.

Wherefore,

IT IS HEREBY ORDERED that judgment on the merits shall be entered in favor of the Federal Defendant and against the Plaintiff on all claims.

DATED this 16th day of October, 1998.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Counsel for Plaintiff: | Steven C. Sugarman<br>Santa Fe, New Mexico |
| Counsel for Defendant: | John W. Zavitz<br>Assistant U. S. Attorney<br>U. S. Attorney's Office<br>District of New Mexico<br>Albuquerque, New Mexico |
| Counsel for Intervenor: | John A. Mitchell<br>Santa Fe, New Mexico |